THE CAPITAL OF PUERTO RICO, Plaintiff, *v.* ERNESTINA ROBLES HILERA ET AL., Defendants and Appellees. FAUSTINO PÉREZ, Intervener and Appellant.

No. 8397. Argued June 11, 1942.—Decided July 14, 1942.

R. *Díaz Collazo* for appellant. *E. Díaz Santana* and *E. Mieres Cali-mano* for appellees.

Mr. Chief Justice Del Toro delivered the opinion of the court.

This is a suit for injunction brought, in the District Court of San Juan, by the Capital of Puerto Rico on April 25, 1940. Prayer was made for the issuance first of·a preliminary writ and then of a permanent writ restraining the defendant Ernestina and Redención Robles from proceeding further with the building of a certain addition—a veranda—to a house belonging to them which encroached on Palma Avenue in Miramar, Santurce, and decreeing the demolition of the portion thereof already built.

A rule to show cause, if any, was issued against the defendants and in the meantime Faustino Pérez, an adjoining owner, appeared and asked for leave to intervene and file a complaint which he attached to his petition. Leave was granted and the complaint allowed to be filed.

A postponement of the hearing which had been set for August 9, 1940, was requested by the plaintiff and the defendants. The court refused such request and heard the evidence introduced by the intervener and ordered the issuance of a preliminary writ.

At this stage, the defendants, on September 3 following, answered the complaints. The hearing of the case had been set for that same day and the intervener objected to the filing of the answers on the ground that they came too late. The court allowed them to be filed.

The Capital of Puerto Rico failed to appear at that hearing. The intervener and the defendants were present. On motion of the latter a continuance was granted until September 7, 1940. The Capital again failed to appear and the hearing was held in its absence, the case being then submitted to the court for its final decision.

In an "order" which preceded its judgment, the court said:

"In the case now before us it was clearly shown that the defendants held lawful title as owners of the lot and also they held and still hold the actual possession.

"If by reason of the apparent laying out of a street or avenue the plaintiffs feel inclined to the belief that they hold the ownership title to a certain lot or part thereof, and this seems to have happened in the present case, let us see then what has been the holding of the Supreme Court of Puerto Rico.

"'A mere belief that title to a property is owned does not justify resorting to an injunction to abate a public nuisance.' 49 P.R.R. 326.

"This doctrine is, in our judgment, applicable to the case now before us, since were we to admit that the structure built by the defendants really encroaches on the street owned by the municipality such a structure would constitute a public nuisance. And this is precisely what has not been proved, that is, that the portion built encroaches on any part of the street, inasmuch as it has not been established that the Capital of Puerto Rico has acquired title to any portion of the lot belonging to the defendants.

"In the case of *Trujillo* v. *López, supra,* the Court also said:

"'A defendant should not be vexed with a suit merely because a plaintiff has some idea that he or the City of Mayagüez has a title to the property.'

"In the cited case an alley was involved. The case at bar concerns a portion of the street.

"In the former the court among the grounds for its decision set forth the following:

"'There is no showing that the municipality has acquired the ownership of said alley by virtue of any title.'

"A similar language might be used in the instant case. It has not been shown that the Capital of Puerto Rico holds title to any portion of the lot owned by the defendants.

"And since this court considers that the foregoing grounds are sufficient for refusing to grant ·the relief sought, it deems it unnecessary to discuss or decide the other questions raised by the parties herein."

In harmony with its viewpoint above set forth, the court, on January 15, 1931, rendered judgment dismissing the complaint and adjudging the plaintiffs to pay the costs and $300 as attorney's fees.

Two days afterwards the intervener appealed from that judgment to this court, and three days later the Capital moved for a reconsideration of the same. On January 28, 1941, the court modified its judgment by imposing on the Capital only such portion of the costs as pertained to it, and reduced the amount of attorney's fees to $200, the whole of it to be paid by the intervener. The latter also appealed from the judgment as modified.

██ All the errors assigned by him relate to the evidence. Therefore, it is necessary to summarize and analyze the same in order to decide whether or not the judgment should be reversed.

The first witness to testify was the intervener himself, Faustino Pérez. He has lived in Miramar, at No. 5 Las Palmas Avenue, Santurce, for about 15 years, in a house belonging to him which adjoins that of the defendants.

When he purchased his house, the house of the defendants had already been built. The building of the veranda had been commenced about a year and a half ago. It was finished about two and a half months ago. The veranda is off the lot. It encroaches on the street. The house of ·the witness is built on the line of the lot fronting the street. That of the defendants projects about one-half meter forward. About three meters have been covered beyond the street line. He never dealt with them except as a citizen, and as a taxpayer he complained to the municipality in order that it should take some action. The municipality adopted

some measures. It ordered the work stopped, but they proceeded with it subreptitiously. The construction affects him.

On cross-examination by counsel for the defendants, he stated that he knew the latter's father, Santiago Robles. When he died the construction of the veranda had already commenced. The pillars and the floor had already been built. While Robles was alive the work was ordered stopped. The witness did not institute any judicial proceedings. He complained to the municipality. The street is paved up to the front of his house. The municipality ordered that the paving of the street should be stopped there. From that place onward it is covered with stones, unfinished.

Julio S. Amill, engineer for the Government of the Capital, was then called to the stand. He acknowledged having drawn a plat of the locality where the houses of the intervener and the defendants were erected. He stated that he had prepared it "in view of the fact that we found when building Palma Street that there was a house belonging to the heirs of Robles which was occupying a portion of the street . . . from east to west. On the west that house covers about 75 centimeters and on the east it covers 2 meters and 40 centimeters," of the area belonging to Palma Street of the Municipality of San Juan.

On cross-examination he stated that when drawing the plat he did not have before him the deed to the property; that he was acting in accordance with the municipal ordinances relating to the opening of streets; that when they were about to repair the street they learned that the veranda encroached on the same; that the municipal archives were examined, and it was found that no permit had been issued for the building of the veranda; that he then personally ordered that a certain ornamentation work which was being done on the pillars erected on the street be stopped and advised one of the defendants accordingly, who admitted that she was doing the work without any permit. He reiterated

that he did not examine any title deeds when drawing the plan, and that he acted in accordance with the ordinances regarding the width of the street.

Upon being examined by the trial judge, he testified thus:

"J. Please tell me, was that street laid out before the construction or the addition to the Robles' house?

"W. That house (street) was originally built without curbing; it had no curbs, and the line of the present building passed precisely under the veranda that was built on that street.

"J. What I wish to know is whether the street had already been laid out by the municipality and provided for in the municipal ordinances when the addition was built.

"W. Yes, sir, it was. It was laid out and its width had been determined up to the boundary before the construction of the veranda.

"J. And do you state that the addition made to the house has encroached on the street?

W. Yes, sir.

"J. That does not mean that by reason of the combined work of the P.W.A. and the municipality the width of the street was altered, but that the width had already been established by a municipal ordinance?

"W. It was already established; but when we went to build the curbing in accordance with the contract we found that the veranda stood on the street.

"J. The added veranda?

"W. The annexed veranda was already constructed encroaching on the street."

The witness was again cross-examined. One of his answers was as follows:

"About a year ago the young lady called at my office and asked for a permit to build a balcony on the veranda. Then I refused because I was not going to allow the erection of a veranda on the street, as we needed the space in order to give it the necessary width."

He stated that he thought that the construction of the veranda began about four or five years ago and that the municipality stopped the work when the case was brought into court, without his being able to say definitely when or to what court the case was taken.

The judge intervened as follows:

"J. You stated that in compliance with the demand of the W.P.A. you had to lay out the curbing. . .

"W. We had to lay out the curbing outside the line where it should be.

"J. That means that the municipality modified its construction line or. . . .

"W. As it is at present it lacks in width. So much so that the paving of the street has not been finished.

"J. What I wish to know is whether the municipality finally accepted that width or whether the width set forth in the ordinance still subsists and the municipality intends to give the street its true width.

"W. As engineer of the Department of Public Works I did not accept it. So much so that we have stopped the work.

"J. That curbing then is temporary?

"W. Temporary. The present situation greatly affects the municipality."

So ended the evidence on direct examination of the plaintiff intervener. The plan drawn by the city engineer was admitted as also a certificate from the registry of property regarding the recording of the lots of the intervener and of the defendants. The evidence introduced by the latter consisted of a certificate regarding the death of Santiago Robles which occurred on January 23, 1938, another certificate regarding the birth on June 17, 1921, of the defendant Redención Robles, a plan prepared by Pedro Iglesias, and the testimony of Ernestina Robles, Pedro González, Luis Torregrosa, Pedro Cruz, Juana Francisca Mora, and Carlos Rodríguez.

Ernestina Robles stated that her father started to build the veranda about eight months before he died; finishing the pillars and the concrete floors. Later, a little over a year ago, she had the balcony built and the pillars plastered. The whole of the veranda stands on the lot "except . . . the easternmost pillar, which stands 60 centimeters outside, towards the street." Further on she said: "In accordance with the

title deeds, my veranda is on my lot. . . . There was no laying out of any street when we purchased . . . Such laying out was undertaken two or three months ago."

She admits that engineer Amill had told her she could not build the veranda, but added that she replied that she was merely going to build a balcony so as to keep the children from falling off and he consented even to the extent of drawing a plan for finishing the balcony.

Pedro González Iglesias, an engineer, at the request of the defendants drew a plan "in accordance with the location of the buildings on the lots." The title deeds were not exhibited to him.

On cross-examination he was asked:

"Did you take into account the width of the street in order to see whether the lot which you were surveying was within the street?"

He answered thus:

"The width of the street could not be taken into account at that place for that street had not been finished."

Luis Torregrosa, a civil engineer, inspected the veranda and stated that it did not obstruct the public traffic underneath the same, and that, according to his observations, the façade of the adjoining house was not affected by the veranda. In the form it was built, it tends to adorn the place.

Pedro Cruz worked on the construction of the veranda, which was completed while Santiago Robles was alive. The balcony was built later, about a year ago.

Juana Francisca Mora stated that her granddaughters, the defendants, live with her in the house in question and that the veranda was built four or five years ago.

Carlos Rodríguez, husband of the defendant Ernestina Robles, stated that the veranda had been built four and a half years ago and that such as it is, it does not obstruct the public traffic.

On rebuttal, the intervener introduced the testimony of Roberto Castro and Pedro G. González. The former stated that he lived on Las Palmas Street and had worked as a mason for the defendants four or six months previously in Miramar, plastering a railing and some pillars; and the latter testified that he lived at 5 Palma Avenue, Miramar, on the second floor of the intervener's house and saw some work being done on the adjoining house owned by the Misses Robles, on the veranda, about six months ago.

In our judgment, the evidence as a whole goes further than the facts held proven by the trial judge. There is no doubt that it could have been more clear and definite, but such as it is it shows that the veranda in question encroaches on the portion of the street which was specified by the city engineer. The case is different from that of *Trujillo* v. *López*, 49 P.R.R. 326, cited by the trial judge. It is analogous to that of *Capella* v. *Carreras*, 48 P.R.R. 811, and 57 P.R.R. 250.

The existence of the street appears from the very title of the defendants recorded in the registry of property, and from the testimony of their own witnesses. It is so evident that one is led to regard it as established and to neglect incorporating into the record the required specific testimony which, by itself, would render it obvious. The record could have been more definite but, we repeat, what it shows as a whole is sufficient.

The attitude assumed by the Government of the Capital is a remarkable one. It was incumbent on that government to prosecute the matter to the end. It had everything necessary at hand and it was bound to enforce the rights of the public in general and of the intervener taxpayer in particular who had requested its aid as the person most directly affected; an aid which it gave the latter in the beginning but which it subsequently refused without any satisfactory

explanation, abandoning him and leaving him to run all the risks of the litigation.

The testimony of the city engineer, graphically illustrated by the plan which he drew, is definite. The avenue called Las Palmas, De la Palma, or Palma, in the suburb of Miramar, Santurce, was already laid out when the predecessor in interest of the defendants and the intervener purchased their lots and built their houses. The house of the intervener follows the lot and the street line and the house of the defendants was also within that line.

It was long afterwards that the violation which gave rise to this suit occurred. The new structure, which encroaches on the street, is a concrete veranda added to the old house. Its construction was begun by defendants' father about four years prior to the suit, and it was continued by the defendants themselves. There was opposition from the start, but experience shows how difficult it is to reach a satisfactory solution in similar cases where an aggressive landowner is involved, especially at such places where the streets have not been finally built with their sidewalks and curbs.

It was precisely when the municipality, taking advantage of the federal aid furnished by the New Deal, began the formal construction of the street, that the violation became so manifest that it could not be concealed. When that place was reached it became impossible to give to the street the same width which it had from the start, and then the suit was brought. Such a construction work rests on the existence of a public street, because neither the municipality nor the Federal Government is empowered to spend public funds at its disposal on private streets.

Besides, what the testimony of some of the witnesses for the defendants tends to show is that the travelling public could pass without difficulty under the veranda even though some of its pillars had been erected on the street. And one of the defenses set up by the defendants in their answer is:

"The defendants allege that they and the plaintiff have reached an agreement whereby, through the payment of a certain sum of money to the plaintiff, the defendants shall become absolute owners of the land which, as alleged in the complaint, is occupied by the addition mentioned therein, and thus putting an end to the litigation between the parties."

In this case justice can not be served by accepting what has been done without any right whatsoever by the predecessor in interest of the defendants and by the defendants themselves, changing the curb line, narrowing the street, and destroying its uniformity, in order to avoid the prejudice resulting from the demolition of a part of the structure.

All persons must suffer the natural consequences of their own acts voluntarily performed by them. And the act performed by the predecessor in interest of the defendants and continued by the latter was not only without right and voluntary, but prejudicial to the public in general and to the adjoining landowner in particular. It is not the same for the public to travel along a street having a uniform width than along one which suddenly becomes narrower and irregular in form. In such case to suffer the natural consequences of the act performed means to have the act undone at the cost of the doer.

We have examined the special defenses set up by the defendants, and, in our judgment, they are groundless.

Although it is true that defendant Redención Robles was less than 21 year of age when the suit was commenced, it is also true that from the certificate of the registrar of property introduced in evidence by intervener it appears that the property in question was recorded as acquired by inheritance "in the name of Ernestina and Redención Robles Hilera of legal age, the latter being emancipated." Nor was it necessary to make the husband of the other defendant a party to the suit, as the latter involved the separate estate of his wife. As to the defense of laches, it will suffice to

say that the facts of the case and the attendant circumstances as they appear from the evidence above set forth do not justify the same, and as to the defense of compromise no evidence in regard thereto was introduced at the trial.

For the reasons stated, the judgment appealed from must be reversed and another rendered instead ordering the defendants to demolish, within 90 days from the receipt in the district court of the mandate of this court, all that portion of the veranda in question built on Las Palmas Street, that is, for a length of ten meters and twenty-five centimeters, beginning with a width of seventy-five centimeters on the western end and ending with a width of two meters and forty centimeters on the eastern end, with costs against the defendants but without including attorney's fees.